# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

THOMAS KOELLEN,

        Plaintiff,

        v.                             Case No. 08-C-1038

WARDEN WILLIAM POLLARD, JEANANNE GREENWOOD,
RICHARD HEIDORN, MD, JAMES GREER, and
JOHN and JANE DOES,

        Defendants.

# DECISION AND ORDER

The plaintiff, who is proceeding pro se, filed this action pursuant to 42 U.S.C. § 1983. He was allowed to proceed on Eighth Amendment medical care claims against the defendants. Both the plaintiff and defendants William Pollard, Jeananne Greenwood, Richard Heidorn, M.D. and James Greer (hereinafter, the defendants) have filed motions for summary judgment, which are now before the court.

The court notes that the plaintiff has submitted no admissible evidence in this case. With their motion for summary judgment, the defendants provided the plaintiff with the notice required by Civil Local Rule 56(a)(1) in cases in which at least one party is proceeding pro se. Civil L.R. 56(a)(1) requires:

> (1) If a party is proceeding pro se in civil litigation and the opposing party files a motion for summary judgment, counsel for the movant must comply with the following procedure:
>
> > (A) The motion must include a short and plain statement that any factual assertion in the movant's affidavit, declaration, or other admissible documentary

evidence will be accepted by the Court as being true unless the party unrepresented by counsel submits the party's own affidavit, declaration, or other admissible documentary evidence contradicting the factual assertion.

(B) In addition to the statement required by Civil L. R. 56(a)(1)(A), the text to Fed. R. Civ. P. 56(e) and (f), Civil L. R. 56(a), Civil L. R. 56(b), and Civil L. R. 7 must be part of the motion.

In this case, the defendants provided both the statement contemplated by Civil L.R. 56(a)(1)(A) and copies of the rules listed in Civil L.R. 56(a)(1)(B). Nevertheless, none of the plaintiff's responses to the defendants' motion are sworn or based on admissible evidence. The plaintiff filed a brief in response to the defendant's motion, but he did not submit an affidavit or proposed findings of fact. Also, he did not respond to the defendants' proposed findings of fact. The plaintiff submitted statements from other prisoners, but they were not sworn declarations made before a notary public, nor did they contain the declaration that they were made under penalty of perjury as set forth in 28 U.S.C. § 1746. Thus, they do not constitute admissible evidence under Rule 56 of the Federal Rules of Civil Procedure. Finally, although a court can construe a sworn complaint as an affidavit at the summary judgment stage, Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996), neither the plaintiff's original complaint, nor his amended complaint are sworn complaints. Therefore, to the extent they are supported by admissible evidence, the court will adopt the defendants' proposed findings of fact as undisputed.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, establish that there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." Anderson, 477 U.S. at 248. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence and all reasonable inferences in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., Ltd., 475 U.S. 574, 587 (1986), Matter of Wade, 969 F.2d 241, 245 (7th Cir. 1992). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324.

The evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT & T Communications, Inc., 972 F. 2d 845, 849 [7th Cir. 1992]). An affidavit submitted to support or to oppose a summary judgment motion "must be made on personal knowledge, set forth facts that would be admissible in evidence and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1).

"It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact." Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir.

2002) (citing Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 724 [7th Cir. 1998]). A finding of fact based on an affidavit which contains conclusory legal statements and is barren of any relevant facts of which the affiant has personal knowledge is not proper under Rule 56(e). See Resolution Trust Corp. v. Juergens, 965 F.2d 149, 152-53 (7th Cir. 1992). Such unsupported conclusory allegations have not been included in the relevant undisputed facts.

## RELEVANT UNDISPUTED FACTS[1]

The plaintiff, Thomas Koellen, is a Wisconsin state prisoner who was housed at Green Bay Correctional Institution (GBCI) from October 18, 2005, through October 6, 2009. Previously, he had been at the Dodge Correctional Institution (DCI).

The defendants are all employees of the Wisconsin Department of Corrections (DOC). Defendant Richard Heidorn, M.D., is employed as a physician at GBCI, and defendant Jeananne Greenwood is the Nursing Supervisor in the Health Services Unit (HSU) at GBCI.[2] She never personally provided any medical treatment to the plaintiff. Defendant William Pollard is the Warden at GBCI, and defendant James Greer is the Director of the Bureau of Health Services (BHS).

### A. The Plaintiff's Medical Treatment

While at GBCI, the plaintiff received frequent medical treatment for a variety of pre-existing chronic medical illnesses. These included treatment for hypertension (high blood

---

[1] The relevant facts are taken from the Defendants' Proposed Findings of Fact, the defendants' affidavits, and the exhibits attached to those affidavits. The plaintiff has not submitted any sworn pleadings in this litigation. Accordingly, to the extent they are supported by the affidavits and exhibits, the Defendants' Proposed Findings of Fact will be accepted as true. See Fed. R. Civ. P. 56(e)(2).

[2] Jeananne Greenwood is now known as Jeananne Zwiers and submitted an affidavit in her current name. Nevertheless, for consistency, the court will continue to refer to her as Jeananne Greenwood.

pressure), dyslipidemia (abnormality of lipids, usually high cholesterol), and morbid obesity. On October 27, 2005, defendant Dr. Heidorn ordered a renewal of the plaintiff's blood pressure medication and for a hypertension care plan appointment.

On November 4, 2005, the plaintiff was seen by Marilyn Vanderkinter, R.N., for complaints of redness and pain in his belly button area that he had experienced one week earlier, which he said was gone now. He told the nurse that he had experienced similar symptoms in 2003. Nurse Vanderkinter provided him with triple antibiotic ointment for future needs, reviewed good hygiene of the area with him, and advised him of the signs and symptoms of infection to report.

On November 10, 2005, Dr. Heidorn saw the plaintiff, completed a new Hypertension Care Plan and ordered x-rays of the plaintiff's elbow and shoulder, analgesic balm, Tylenol, an electrocardiogram (EKG), and a follow up appointment in two months. Roxanne Klarkowski, L.P.N., completed the EKG on November 17, 2005, which showed a sinus bradycardia (slow heart rate, but normal conduction). According to Dr. Heidorn, this was typical for the plaintiff because of his medications.

On December 22, 2005, the plaintiff was seen by Kathy Lemens, R.N., for complaints of frequent voiding, discomfort related to a bunion on his right foot, and a cyst on his left shoulder. The plaintiff also was concerned that he had prostrate cancer. Nurse Lemens advised the plaintiff that his blood pressure medication probably caused the frequent voiding. She noted a large bunion on the plaintiff's right foot, as well as several other reddened areas. The plaintiff stated that the bunion had doubled in size in the past year. Nurse Lemens also noted a soft, egg-sized lump on the plaintiff's left posterior shoulder and subsequently scheduled the plaintiff for an appointment with a doctor for

further assessment.

On December 30, 2005, the plaintiff saw Norine Sadowski, R.N., because he was spitting up blood. He denied spitting up blood during the previous few days. He also reported a cough and fever for one week. Nurse Sadowski found that the plaintiff's ears were impacted with ear wax and his nostrils were red and swollen with clear drainage. Nurse Sadowski provided the plaintiff with Ibuprofen, nasal spray, and cough medicine, and scheduled him for a nursing follow up for his ears. At the follow up appointment on January 6, 2006, Sephanie Sequin, R.N., flushed the plaintiff's ears and removed a large amount of wax. She noted redness and slight bloodiness in his ear canals and started the plaintiff on antibiotics, per a physician's orders.

On January 11, 2006, Dr. Heidorn saw the plaintiff and addressed the plaintiff's hypertension, bunion, shoulder, cyst on back/shoulder, and elbow pain. X-rays showed arthritis and old healed fractures. Dr. Heidorn encouraged the plaintiff to be compliant with his hypertension plan, including his medication. Dr. Heidorn ordered a foot basin and Epsom salts for soaking the plaintiff's bunion, Ibuprofen for the pain, and an extra mattress for the plaintiff.

On March 7, 2006, Nurse Vanderkinter saw the plaintiff after he complained of pain in the area of the bunion on his right foot and going up into the foot, ankle to lower leg area. The plaintiff reported a long history of bunions. Nurse Vanderkinter noted a thick and crusty bunion on the plaintiff's left foot and found a one-inch open area on the bottom of the plaintiff's right toe that had clear drainage. Also, the plaintiff's foot and ankle felt warm to the nurse's touch. The plaintiff complained that he could not wear shoes and stated that he had been doing foot soaks up to three times per day and had applied triple

antibiotic ointment to the open area. Nurse Vanderkinter requested a physician evaluation, which was provided by Dr. Heidorn.

Dr. Heidorn ordered Sick Cell for one week, an extra pillow and a lower bunk restriction for one month. Dr. Heidorn recommended that the plaintiff wear shower shoes as much as possible and stop soaking his foot. Dr. Heidorn also had a culture and sensitivity done on the open toe area and injected one gram of Rocephin. He ordered the injections for three days and prescribed oral antibiotics to be taken four times a day for ten days. On March 8, 2006, Nurse Vanderkinter injected the plaintiff with the second dose of Rocephin, and Nurse Sequin gave the plaintiff the third injection on March 9, 2006.

Dr. Heidorn saw the plaintiff for a follow-up appointment on March 10, 2006. At that time, the open area on the plaintiff's foot was responding well to treatment and had shrunk from one inch on March 7, 2006, to one centimeter in diameter. Dr. Heidorn ordered the plaintiff to continue the oral antibiotics, foot soaks, and antibiotic treatment.

The plaintiff had another follow-up appointment with Dr. Heidorn three days later, on March 13, 2006. Dr. Heidorn noted that the plaintiff's foot appeared to be continuing to heal and that the open area had gotten even smaller, now measuring eight millimeters. On March 22, 2006, Dr. Heidorn saw the plaintiff for another follow-up. The open area on the plaintiff's foot appeared to be continuing to heal and measured only five millimeters in diameter. The doctor scheduled the plaintiff for another appointment two weeks later.

On April 10, 2006, Dr. Heidorn treated the plaintiff for complaints of a red, hot swollen foot. The doctor noted that no open areas were visible and that the distal half of the foot was red, swollen and tender to the touch. Dr. Heidorn diagnosed the plaintiff with cellulitis (an inflammation) and ordered that he be placed in a HSU bed with his foot

elevated. The doctor also prescribed oral and injected antibiotics and directed that the plaintiff's foot be soaked in water and antibiotic soap three times per day. Dr. Heidorn prescribed 800 milligrams of Ibuprofen three times a day for the plaintiff's pain and also ordered blood work, urine analysis, and culture and sensitivity done if drainage occurred. Nurse Sequin administered the plaintiff's injection of Rocephin that day.

On April 11, 2006, Nurse Vanderkinter drew lab work, including a complete blood count, sedimentation rate, complete health profile, uric acid, and obtained a clean catch urine sample. The results of the uric acid test were within normal limits, which suggested the plaintiff was suffering from an infection, not gout. Also on April 11, 2006, a preliminary assessment revealed that the plaintiff's right foot had increased swelling and that the entire foot had reddened and was warm to the touch. The physician was updated. When Nurse Lemens administered the plaintiff's Rocephin injection, she noted that the plaintiff had been sitting on the edge of his bed reading a book with his legs dangling down. She counseled the plaintiff to keep his right foot elevated at all times, except to go to the bathroom or during meals.

On April 12, 2006, Dr. Heidorn ordered that the plaintiff be transferred to the hospital emergency room because he was not responding adequately to the treatment ordered for his foot. Nurse Lemens remained in touch with the hospital while the plaintiff was there. She was advised that the plaintiff was on monitored bed rest and was receiving intravenous antibiotics.

On April 14, 2006, when Nurse Lemens spoke with a case manager at the hospital, she was informed that there was no improvement with the plaintiff's foot and that his temperature had spiked. On April 17, 2006, when she spoke to the hospital case manager,

she was advised that the plaintiff continued to receive intravenous antibiotics and would possibly be discharged the following day.

On April 18, 2006, the plaintiff was released back to the prison and Dr. Heidorn saw him upon his return. Dr. Heidorn ordered that the plaintiff remain in a HSU bed, with his foot elevated, and that he not put weight on his foot and use crutches for one week. He also reviewed the plaintiff's medications, which included antibiotics, blood pressure medications, non-steroidal anti-inflammatory drugs, and a narcotic pain reliever.

On April 19, 2006, Nurse Sanchez noted that the plaintiff was in his HSU bed with his foot elevated and non-weight bearing. She also noted that the plaintiff's foot appeared red and that he was still taking antibiotics. She followed up on April 20, 2006, and saw no changes. On April 22, 2006, Nurse Bridget Bailey noted improvement in the plaintiff's foot because it was slightly pink, whereas previously it had been bright red. Nurse Bailey noted no change in the plaintiff's foot on April 23, 2006, but noted that he was not taking his pain medication.

Nurse Lemens saw the plaintiff on April 24, 2006. She noted a trace of edema, but there was no redness and no open sores. The skin on the plaintiff's foot was warm and dry. The plaintiff denied any pain. Dr. Heidorn saw the plaintiff the same day and released him from the HSU bed with orders for the nursing staff to continue his treatment.

On April 28, 2006, Nurse Lemens noted that the plaintiff's right foot had not changed and that his foot had minimal edema (swelling). The plaintiff saw Nurse Lemens again on May 1, 2006, because he was concerned about swelling in his right foot. She noted minimal edema and redness that remained unchanged from his last visit. The plaintiff reported that he had new, larger shoes that minimized rubbing. Dr. Heidorn saw the

plaintiff and instructed him on the need to continue elevating his foot and staying off of it as much as possible. The plaintiff told the doctor that he understood. Dr. Heidorn also ordered additional antibiotics, x-rays of the plaintiff's right big toe, and a follow-up of culture results.

On May 4, 2006, Nurse Lemens noted that x-rays showed significant deviation of the plaintiff's right big toe, a large bunion, and moderate arthritic changes in the right big toe. Dr. Heidorn reviewed the results, but gave no new orders.

On May 22, 2006, Dr. Heidorn noted a prominent deviation of the plaintiff's right big toe and a bunion, but minimal irritation. Dr. Heidorn ordered larger shoes for the plaintiff to help relieve any pressure on the foot. He also prescribed Tylenol when necessary, foot soaks, triple antibiotic ointment on lesions, and follow-up appointments when necessary.

On May 31, 2006, the plaintiff requested treatment for red, painful eyes. He saw Nurse Sanchez who gave him Neosporin and eye drops and scheduled him to see the physician the next day. Dr. Heidorn gave the plaintiff a preliminary diagnosis of conjunctivitis on June 1, 2006, and noted that the plaintiff was responding to treatment. In a follow-up appointment the next day, Dr. Heidorn diagnosed bilateral conjunctivitis and noted that the plaintiff was no longer responding to treatment. He referred the plaintiff to an eye specialist at the Green Bay Eye Clinic. The plaintiff was given TobraDex and Zylet drops. On June 3, 2006, Nurse Bailey followed up with the plaintiff.

On July 4, 2006, Nurse Vanderkinter saw the plaintiff for a possible infection in his belly button. She noted a small area of deep pink color, but it was not tender, and had no drainage or foul order. She instructed the plaintiff on good hygiene and encouraged him to lose weight.

Dr. Heidorn saw the plaintiff on August 15, 2006, and observed that the plaintiff's eyes were red, watery, and itchy, with purulent drainage in the morning. Dr. Heidorn preliminarily assessed Bleph conjunctivitis, gave the plaintiff prescriptions for Neo/Poly/Dex and Cromolyn, and ordered a follow up appointment in two or three weeks. When Dr. Heidorn saw the plaintiff on August 29, 2006, he noted a marked decrease in conjunctivitis and ordered the plaintiff to continue taking the Cromolyn. At a follow-up appointment on October 5, 2006, Dr. Heidorn noted minimal conjunctivitis, as well as the plaintiff's allergies. He ordered the plaintiff to continue taking Cromolyn and scheduled a physician follow-up appointment in six months.

On October 23, 2006. Nurse Lemens replaced the plaintiff's foot basin because it was cracked. She instructed him to continue using it for his bunions. On December 4, 2006, Dr. Heidorn saw the plaintiff regarding the plaintiff's feet and hemorrhoids. Dr. Heidorn ordered continued foot soaks, triple antibiotic ointment, and hemorrhoid ointment. The doctor also authorized an extra mattress for the plaintiff to use.

On January 8, 2007, Nurse Lemens saw the plaintiff for an infected foot. The plaintiff's right big toe had reddened, was swollen and calloused, and had an open area, but no drainage. He reported that the area was painful and warm to the touch, and that he had been having symptoms for two or three days. Dr. Heidorn also saw the plaintiff and ordered an oral antibiotic and daily showers in HSU. He also ordered and obtained a culture and sensitivity and scheduled a follow-up appointment for January 12, 2007.

On January 12, 2007, the plaintiff reported that his pain had improved. Nurse Vanderkinter noted a dime-sized area with no drainage that was dark in color with whitish edges. She instructed the plaintiff to ask to see a nurse when he was in HSU for his daily

shower if he was not improving within a month. On January 16, 2007, Nurse Vanderkinter drew blood from the plaintiff and obtained a clear urine sample from him.

On January 18, 2007, Dr. Heidorn preliminarily assessed the plaintiff's right fool which appeared to have hemorrhaged into a callous that the plaintiff had attempted to trim. Dr. Heidorn discontinued the antibiotic, but ordered a continued regimen of foot soaks, daily showers, and antibiotic ointment. Dr. Heidorn had the plaintiff's uric acid level checked again and scheduled a follow up appointment.

At the follow-up appointment on January 22, 2007, Dr. Heidorn noted that the plaintiff's lab work had shown a high uric acid level. Based on those results, as well as the redness and heat of the plaintiff's right big toe, Dr. Heidorn diagnosed a deviated toe and probable gout. He discontinued Ibuprofen and started the plaintiff on Indocin/Allopurinol for the gout. He also ordered repeat lab work in six weeks and a follow-up appointment in two weeks.

On February 5, 2007, Dr. Heidorn found that the plaintiff's foot had improved. When Dr. Heidorn asked the plaintiff about his gout, he responded that it was better and that the pills were working. Lab work drawn by Nurse Sequin on March 19, 2007, showed the plaintiff's uric acid levels to be in the expected range.

Dr. Heidorn saw the plaintiff on April 11, 2007, as part of the plaintiff's Hypertension Care Plan. The plaintiff blood pressure was marginal, and Dr. Heidorn ordered a follow-up appointment in six weeks. On May 30, 2007, Dr. Heidorn reviewed the plaintiff's medications in his Hypertension Care Plan and the results of the lab work Nurse Sequin had drawn on May 10, 2007. The plaintiff's uric acid level was in the normal range and Dr. Heidorn ordered a physician follow-up appointment in three months.

On July 12, 2007, the plaintiff was seen by Nurse Sequin at the Blood Pressure Clinic. On August 13, 2007, the plaintiff had a tuberculosis skin test done and the result was negative. On August 27, 2009, Nurse Lemens drew blood work. Nurse Sequin also saw the plaintiff that day at his request because he was feeling dizzy. The plaintiff's blood pressure was slightly high and he was scheduled for a follow-up appointment the next week.

On September 10, 2007, Dr. Heidorn reviewed the plaintiff's Hypertension Care Plan and added aspirin to the plaintiff's medication regimen. The doctor ordered a physician follow-up in three months. The plaintiff had his blood pressure checked on September 12, 2007, at the Blood Pressure Clinic.

On October 18, 2007, Nurse Vanderkinter saw the plaintiff because he was experiencing nasal drainage, his head felt stuffed up and he was coughing nightly. She preliminarily assessed cold/sinus congestion and treated him according to nursing protocol. Nurse Vanderkinter saw the plaintiff again on October 24, 2007, after he requested ear wax removal drops. However, there was no wax build up in the plaintiff's ears at the time and Nurse Vanderkinter advised the plaintiff to speak with the physician at his next appointment. She also re-checked the plaintiff's blood pressure. When the plaintiff told Nurse Vanderkinter that he had not taken his blood pressure medication yet that day, she strongly advised him to take his medication first thing in the morning. The plaintiff's blood pressure also was checked on November 15, 2007, November 21, 2007, November 29, 2007, and December 6, 2007.

On December 13, 2007, Brenda Schneider, L.P.N. drew lab work and collected a urine sample from the plaintiff on December 13, 2007. His uric acid level was within

normal limits.

On December 18, 2007, Dr. Heidorn reviewed the plaintiff's Hypertension Care Plan and noted a slight decrease in red blood cells and hematocrit. Dr. Heidorn changed the plaintiff's medications and scheduled a physician follow-up and lab work in two months.

In January 2008, when Nurse Komorowski saw the plaintiff, she explained and gave him an occult stool sample kit. On January 14, 2008, Nurse Sequin noted that the plaintiff's three stool samples were negative for occult blood. Dr. Heidorn ordered lab work on February 7, 2008, and reviewed the plaintiff's Hypertension Care Plan on February 12, 2008. He ordered lab work and a follow-up appointment in two months.

On February 22, 2008, Nurse Sequin saw the plaintiff because of his concern about an infection under his right big toe. The plaintiff rated his pain as "three" on a scale of one to ten. Dr. Heidorn subsequently ordered antibiotics and follow-up appointments for a callous trim, foot soaks, and a recheck of his toe. On February 26, 2008, Nurse Lemens looked at the plaintiff's toe, noting that it was healing well and had no open area or drainage. She instructed the plaintiff to continue taking his medication as ordered. On February 27, 2008, Dr. Heidorn checked the plaintiff's blood pressure.

On March 3, 2008, Nurse Lemens saw the plaintiff for a red spot on his eye and right-side neck pain. She noted a small reddened area in his eye, but his vision was okay. The plaintiff reported that he had woken up with a stiff neck that morning, but he had a full range of motion and denied injury. Nurse Lemens advised the plaintiff to do stretching exercises and apply warm compresses to his neck.

On April 3, 2008, Nurse Lemens drew lab work and took a urine sample from the plaintiff. The plaintiff's uric acid level was within normal limits at this time which indicated

that his gout was under control. Nurse Komorowski looked at the plaintiff's right big toe and noticed the under side had three blood-like blister spots. Dr. Heidorn evaluated the plaintiff's toe and ordered antibiotics, foot soaks, and shower shoes for the plaintiff's use when he was not working. He also ordered a follow-up appointment. The plaintiff also had his blood pressure checked on April 10, 2008.

On April 17, 2008, Nurse Lemens saw the plaintiff for a follow-up appointment regarding his right big toe. She noted that the area appeared to be healing with no redness, drainage, or swelling. Nurse Lemens instructed the plaintiff to continue with his foot soaks and antibiotic ointment. At another follow-up appointment on April 24, 2008, Nurse Lemens again noted that the plaintiff's right big toe appeared to be healing well. She advised him to continue care and to leave his toe open to allow for further healing.

On May 5, 2008, Dr. Heidorn reviewed the plaintiff's Hypertension Care Plan and added fish oil to the plaintiff's medications. He followed up the care plan with lab work in three months. Blood work drawn on May 22, 2008, showed that the plaintiff's uric acid levels continued to be within normal limits. Shari Heinz, R.N., saw the plaintiff for right big toe pain and she observed that the toe was swollen, red and tender to touch. Nurse Heinz consulted with the physician, who ordered that the plaintiff receive Rocephin, which the nurse administered via injection the following day.

At a follow-up appointment the next day, the plaintiff reported increased comfort and Nurse Lemens noted decreased inflammation and swelling. Nurse Lemens told the plaintiff to let HSU know of any changes to his condition.

On June 2, 2008, Nurse Lemens saw the plaintiff for another follow-up appointment. The plaintiff again reported increased comfort and Nurse Lemens observed decreased

swelling and no redness.  She scheduled a follow-up appointment in two weeks. The plaintiff's blood pressure was checked on June 5, 2008.

The plaintiff had another follow-up appointment regarding his toe on June 19, 2008. He complained that his toe was not getting better.  Although it had been improving for a while, he felt it was getting worse again.  The nurse noted that the plaintiff's right big toe had a moderate amount of swelling and a crusted callous that was painful to the touch. She instructed the plaintiff to continue foot soaks with bacitracin ointment and also scheduled him for an appointment with the physician.  On July 11, 2008, Dr. Heidorn saw the plaintiff and ordered continued foot soaks, hemorrhoid cream, and a change in blood pressure medication.  He scheduled a physician appointment in one month.

On July 17, 2008, Nurse Treml saw the plaintiff regarding his toe and drew blood work to check the plaintiff's uric acid level, which was within normal limits.  She provided him with his new blood pressure medication.  Dr. Heidorn also saw the plaintiff and ordered an increase in his gout medication.

On August 5, 2008, Dr. Heidorn noted that the plaintiff's blood pressure was still elevated and that his weight was increasing.  The plaintiff had blood work drawn and gave a urine sample on August 7, 2008.  Dr. Heidorn reviewed the plaintiff's Hypertension Care plan on August 11, 2008.   On August 21, 2008, Brooke Garthwaite, L.P.N. collected another urine sample from the plaintiff.

The plaintiff saw Kathy Geier, R.N. on August 29, 2008, for his complaints of drainage, warmth, and tenderness of his right big toe, as well as a hard lump in his left arm pit area.  Dr. Heidorn administered, via injection into the plaintiff's arm pit area, the first of four doses of Rocephin.  Dr. Heidorn also ordered oral antibiotics and placed the plaintiff

in a HSU bed with an order for daily showers with Betasept.

On August 30, 2008, Nurse Geier administered the plaintiff's second dose of Rocephin. She noted a decrease in redness and in the size of the lump. The plaintiff told Nurse Geier that he had decreased tenderness and that he had not yet taken his blood pressure medication that day.

On August 31, 2008, Nurse Geier administered the plaintiff's third dose of Rocephin. She noted that the plaintiff's arm pit area appeared pink, felt slightly warm and was slightly tender to the touch. The plaintiff's blood pressure continued to be high and Nurse Geier gave the plaintiff his blood pressure medication.

On September 1, 2008, Nurse Komorowski administer the fourth and last dose of Rocephin to the plaintiff. She noted that a small lump was still present in the plaintiff's left arm pit and that his bicep area felt slightly warm. On September 2, 2008, Nurse Geier noted that the plaintiff's condition had improved significantly and that the lump was half of its original size and had no warmth or tenderness. Dr. Heidorn released the plaintiff to his regular housing unit. On September 4, 2008, Nurse Geier checked the plaintiff's blood pressure. Nurse Lemens drew lab work from the plaintiff on October 2, 2008.

On October 14, 2008, Dr. Heidorn reviewed the plaintiff's Hypertension Care Plan, ordered additional lab work and scheduled a physician appointment for the plaintiff in three months. On December 8, 2008, Nurse Treml checked the plaintiff's blood pressure which was elevated. She consulted with Dr. Heidorn who advised the plaintiff to let HSU know if he developed any chest pain. The plaintiff reported that he felt fine, except for hot flashes. The plaintiff's blood pressure was checked again the following day.

On December 10, 2008, Shane Garland, R.N. saw the plaintiff for pain in his left

knee which appeared to be swollen. Nurse Garland gave the plaintiff Tylenol per protocol and scheduled him to be seen by a physician. Nurse Vanderkinter checked the plaintiff's blood pressure on December 16, 2008. New physician orders instructed weekly follow-up appointments for the plaintiff.

On December 18, 2008, Dr. Heidorn saw the plaintiff regarding his blood pressure and his left knee. Dr. Heidorn added two new medications to the plaintiff's regimen and scheduled follow-up appointments for January of 2009.

On December 23, 2008, Nurse Treml saw the plaintiff as part of his weekly blood pressure checks based on physician's orders. The plaintiff's blood pressure also was checked on December 30, 2009, January 6, 2009, and January 12, 2009. The plaintiff also had blood drawn by Renee Fameree, L.P.N., on January 8, 2009, and his uric acid levels were within normal limits.

On January 15, 2009, Dr. Heidorn reviewed the plaintiff Hypertension Care Plan and followed up with him regarding his knee. Dr. Heidorn ordered an x-ray of the plaintiff's left knee and his preliminary opinion was probable degenerative joint disease that had been aggravated by weight. The x-ray taken on January 22, 2009, showed degenerative changes, but no evidence of an acute injury.

On February 10, 2009, Nurse Treml checked the plaintiff's blood pressure. On February 13, 2009, Dr. Heidorn reviewed the plaintiff's Hypertension Care Plan and advised weight loss. He also prescribed a non-steroidal, anti-inflammatory drug for the plaintiff's degenerative joint disease in his knee. On February 23, 2009, Dr. Heidorn saw the plaintiff based on the plaintiff's request for an injection in his knee. After a discussion, the plaintiff decided to wait on the injection and said he would try to lose some weight. Dr.

Heidorn told the plaintiff that an injection would be administered if the plaintiff changed his mind.

The plaintiff had his blood pressure checked on April 13, 2009, May 14, 2009, and May 21, 2009. On May 7, 2009, Dr. Heidorn reviewed the plaintiff's Hypertension Care Plan, increased the plaintiff's blood pressure medications and scheduled a follow-up appointment in two months. He also administered an injection to the plaintiff's left knee for pain relief.

On May 19, 2009, Nurse Komorowski saw the plaintiff due to his complaint of swollen lymph nodes. The plaintiff reported that he had a baseball-sized lump near his ear lobe a few days earlier, but that it had since drained. The nurse noted that the plaintiff's face appeared symmetrical, with no swelling, but the nurse observed a mild redness in the area and a small lump. The nurse consulted with Dr. Heidorn, who prescribed oral antibiotics and scheduled a follow-up appointment one week later.

The plaintiff saw Nurse Komorowski on May 26, 2009, for a follow-up appointment regarding an infection on his face. The infection had resolved and there was no lump or redness. The plaintiff was advised to finish taking his antibiotics and to let HSU know if the infection returned.

The plaintiff's blood pressure was checked on June 8, 2009, and June 26, 2009. When Dr. Heidorn checked the plaintiff's blood pressure on June 26, 2009, he noted that the plaintiff's blood pressure had improved and urged him to continue to take his medications. The plaintiff had blood work drawn on July 8, 2009, and his blood pressure was checked on July 20, 2009.

On July 24, 2009, Paul Sumnicht, M.D., reviewed the plaintiff's Hypertension Care

Plan, added vitamin D to the plaintiff's regimen and scheduled a follow-up appointment in three months. The plaintiff's blood pressure was checked on August 24, 2009, and September 21, 2009.

On September 1, 2009, the plaintiff requested a sick call, but then stated he felt better and canceled the appointment. The plaintiff had blood drawn on October 1, 2009. This was the last treatment he received at GBCI before his transfer to Oshkosh Correctional Institution (OCI) on October 6, 2009.

## B. Health Services Unit Staff Levels at GBCI

At all times relevant to this action, the GBCI's Health Services Unit was completely staffed as budgeted by the State of Wisconsin. The budget allows the following staff at GBCI: 6 registered nurses, 1 registered nursing manager, 1.5 medical program assistants, 1.5 licensed practical nurses, 1 medical doctor, 3.5 psychologists, 1 psychologist supervisor, 1 dental assistant, .8 dentist, .4 dental hygienist, 1 crisis intervention worker, and .8 psychiatrist. The Bureau of Health Services also provided two or three additional agency nursing positions for licensed practical nurse or medical program assistants.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants seek summary judgment on the plaintiff's Eighth Amendment medical care claims. The defendants assert that there is no basis in the record for a determination that they were deliberately indifferent to the plaintiff's medical needs. They also maintain that there is no evidence to support the plaintiff's claim against Warden Pollard and Greer that they were deliberately indifferent to his medical needs because they failed to maintain adequate staffing in the HSU at GBCI.

In opposing the motion, the plaintiff contends that his gout should have been diagnosed earlier and that it would have been discovered if more vigorous tests had been conducted earlier. He states that he suffered for two years and has permanent and/or continuing damage as a result of the delay in treatment. Additionally, the plaintiff argues that he had trouble getting appointments with HSU and, at one point, a sergeant had to take him to the HSU to be seen because he was in so much pain, but there was no appointment for him.

In Duckworth v. Ahmad, 532 F.3d 675, 678-79 (7th Cir. 2008), the court set forth the legal standard for Eighth Amendment medical care claims:

> The states have an affirmative duty to provide medical care to their inmates. Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). And the upshot of this duty is that the "deliberate indifference to [the] serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'" and violates the Eighth Amendment's prohibition against cruel and unusual punishments. Id. at 104, 97 S.Ct. 285. To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. Sherrod v. Lingle, 223 F.3d 605, 610 (7th Cir. 2000). Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts. Id. And although deliberate means more than negligent, it is something less than purposeful. Farmer v. Brennan, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he ... draw[s] the inference." Id. at 837, 114 S.Ct. 1970. A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006).

The defendants concede that the plaintiff "arguably had a serious medical need." (Defendants' Brief in Support of Motion for Summary Judgment, p. 8). Thus, the court considers whether each of the defendants was deliberately indifferent to the plaintiff's serious medical need.

## A.     Jeananne Greenwood

Section 1983 does not allow actions against persons merely because of their supervisory roles. T.E. v. Grindle, 599 F.3d 583, 588 (7th Cir. 2010); Palmer v. Marion County, 327 F.3d 594 (7th Cir. 2003). Since a § 1983 cause of action is against a "person," in order "[t]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." Johnson v. Snyder, 444 F.3d 579, 583 (7th Cir. 2006) (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)). In order to be personally responsible, an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id.

Defendant Greenwood has presented admissible evidence, in the form of her affidavit, that she was not involved in the plaintiff's medical care. Nor is there any evidence in the record to suggest that she knew about, facilitated, approved, condoned, or turned a blind eye to conduct that was deliberately indifferent to the plaintiff. Thus, the plaintiff has failed to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Therefore, the court will grant summary judgment in favor of defendant Greenwood.

## B.     Dr. Richard Heidorn

None of the plaintiff's contentions regarding alleged deficiencies in his medical treatment are supported by evidence. "It is well-settled that conclusory allegations . . .

without support in the record, do not create a triable issue of fact." Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002). Thus, all the court can do is review the entirety of the medical treatment provided to the plaintiff to determine if it evidences deliberate indifference.

"For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Jackson v. Kotter, 541 F.3d 688, 697 (7th Cir. 2008) (internal citations and quotations omitted). Medical professionals must provide medical treatment that reflects "professional judgment, practice, or standards." Id. (quoting Sain v. Wood, 512 F.3d 886, 895 (7th Cir. 2008). "There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." Jackson, 541 F.3d at 697 (citing Snipes v. DeTella, 95 F.3d 586, 592). "A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances." Jackson, 541 F.3d at 698 (internal quotations and citations omitted).

The undisputed facts show that Dr. Heidorn and other members of the HSU staff treated the plaintiff frequently and thoroughly, in addition to their regular monitoring of his chronic conditions. Nothing in the plaintiff's medical records suggests deliberate indifference to his complaints regarding his right foot. The plaintiff first presented with foot pain on March 7, 2006. In response, Dr. Heidorn ordered Sick Cell for a week, oral and injected antibiotics, a culture and sensitivity. The plaintiff's foot was responding to

treatment, and the open area shrunk from one inch to one centimeter in diameter in four days. He had two weekly follow-up appointments at which Dr. Heidorn noted that the foot appeared to be continuing to heal. Then, when the plaintiff's condition worsened on April 10, 2006, Dr. Heidorn ordered the plaintiff placed in a HSU bed and once again prescribed oral and injected antibiotics, as well as Ibuprofen for pain relief and tests. The tests included the plaintiff's uric acid level, which was within the normal range. Two days later, Dr. Heidorn ordered that the plaintiff be transferred to the hospital emergency room because he was not responding adequately to treatment. A GBCI nurse monitored the plaintiff's condition while he was in the hospital through calls with a hospital case manager. After his return to GBCI, the plaintiff stayed in a HSU bed for almost a week and then had several follow-up appointments after his release to his normal housing unit.

On January 8, 2007, the plaintiff presented with an infected foot. Dr. Heidorn saw the plaintiff and ordered an oral antibiotic and daily showers in HSU, as well as a culture and sensitivity. The plaintiff's pain had improved by his follow-up appointment on January 12, 2007. He saw Dr. Heidorn on January 18, 2007, who preliminarily assessed that the plaintiff appeared to have hemorraghed into a callous. Dr. Heidorn discontinued the antibiotic but ordered continued foot soaks, daily showers, and antibiotic ointment. Dr. Heidorn also had the plaintiff's uric acid level checked, and it was high. At a follow-up appointment on January 22, 2007, Dr. Heidorn diagnosed probable gout. He started the plaintiff on medication for the gout and scheduled repeat lab work and another follow-up appointment. On February 5, 2007, Dr. Heidorn found that the plaintiff's foot had improved. The plaintiff told him that the pills were working. Lab work drawn on March 19, 2007, showed the plaintiff's uric acid level back within the normal range.

On February 22, 2008, the plaintiff once again expressed concern about an infection in his right big toe. Dr. Heidorn ordered antibiotics and follow-up appointments. On February 26, 2008, Nurse Lemens noted that the plaintiff's toe was healing well and had no open area or drainage.

Dr. Heidorn evaluated the plaintiff's right big toe on April 3, 2008, and ordered treatment and follow-up appointments. On both April 17, 2008, and April 24, 2008, Nurse Lemens noted that the plaintiff's right big toe appeared to be healing well. On May 22, 2008, the plaintiff's right big toe was swollen, red and tender to the touch, and he received a Rocephin injection per physician's orders. The plaintiff reported increased comfort the day after the injection, and Nurse Lemens noted decreased inflammation and swelling. The plaintiff also reported increased comfort at a follow-up appointment on June 2, 2008. However, by the plaintiff's follow-up appointment on June 19, 2008, he complained that his toe was not getting better. The nurse gave the plaintiff instructions to continue foot soaks and bacitracin ointment and scheduled the plaintiff for a physician appointment. Dr. Heidorn saw the plaintiff on July 11, 2008, and July 17, 2008. At the later appointment, Dr. Heidorn prescribed an increase in the plaintiff's gout medication.

The plaintiff also was treated for an infection in his left arm pit area beginning on August 29, 2008, for which he received four doses of Rocephin and oral antibiotics. The plaintiff was placed in a HSU bed and given daily showers with Betasept. At that time, the plaintiff also complained of drainage, warmth, and tenderness in his right big toe. It appears that the plaintiff's complaints about his toe were secondary because the follow-up appointments focused on the left arm pit area infection.

Each time the plaintiff presented with foot problems he was seen and treated, and

the treatment was escalated when he did not respond. Follow-up appointments were conducted at regular intervals, and the plaintiff continued to be treated for his chronic conditions. The plaintiff had well over one hundred contacts with HSU during his almost four years at GBCI. Additionally, his uric acid levels were tested at least nine times, beginning in April 2006, and the plaintiff began receiving medication for gout in January 2007. Considering all the undisputed evidence, no reasonable jury could find that Dr. Heidorn deliberately indifferent to the plaintiff's serious medical need.

At most, the plaintiff's contentions amount to a disagreement with the medical treatment he received. Disagreement with medical professionals about treatment needs cannot sustain an Eighth Amendment claim under the deliberate indifference standard of Estelle v. Gamble, 429 U.S. 97 (1976). Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003). Accordingly, the court will grant summary judgment in favor of defendant Dr. Heidorn.

**C.    Warden William Pollard and James Greer**

The plaintiff also is proceeding on a claim against defendants Pollard and Greer that their failure to maintain adequate staffing levels in the HSU at GBCI constituted deliberate indifference to his serious medical needs. The undisputed facts establish that the HSU at GBCI was, at all times relevant, completely staffed consistent with the State of Wisconsin's budget. The HSU also had two or three additional staff members provided by the Department of Correction's Bureau of Health Services. The plaintiff has presented no evidence that positions were unfilled or that this staffing level was inadequate.

Based on the evidence in the record, a reasonable jury could not conclude that there was inadequate staffing in the HSU at GBCI or that the staffing in the HSU resulted in

deliberate indifference to the plaintiff's serious medical needs. Therefore, summary judgment will be granted to defendants Pollard and Greer.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In his motion for summary judgment, the plaintiff makes a general assertion that the evidence provided shows that the defendants were deliberately indifferent to the serious medical condition his foot presented, which resulted in him being transported to the local hospital for emergency treatment with intravenous antibiotics. The plaintiff also suggests that he had gout months before it was diagnosed. The plaintiff further maintains that some of the failure to timely treat him resulted from the HSU being short-staffed.

In granting the defendants' motion for summary judgment, the court has determined that the defendants were not deliberately indifferent to the plaintiff's serious medical needs. Despite the plaintiff's contention that the HSU was inadequately staffed and that sergeants had to make phone calls on his behalf before he was seen by medical personnel, he has presented no evidence to support his assertions. Rather, the record before the court indicates that the HSU was fully staffed while the plaintiff was incarcerated at GBCI. Because the plaintiff's arguments are unsupported by evidence in the record, his motion for summary judgment will be denied.

## JOHN DOES AND JANE DOES

The defendants' motion for summary judgment was brought on behalf of the named defendants only. At screening, the plaintiff also was allowed to proceed on claims against unnamed nurses identified as John Does and Jane Does. The discovery deadline in this case was January 4, 2010. The plaintiff has never identified these unnamed nurses or

asked the court for leave to amend his complaint to do so. In light of the court's decision granting summary judgment for the named defendants, the plaintiff may decide not to pursue his claims against the John Doe and Jane Doe defendants. Nonetheless, the plaintiff will be provided an opportunity to identify by name the John Does and Jane Does listed in his complaint. The plaintiff must identify these individuals on or before October 15, 2010. If the plaintiff does not identify these individuals by October 15, 2010, so that they can be served, the plaintiff's deliberate indifference claims against the John Does and Jane Does will be dismissed.

### ORDER

**NOW, THEREFORE, IT IS ORDERED** that the plaintiff's motion for summary judgment be and hereby is **denied**. (Docket #53).

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by defendants Jeananne Greenwood, Richard Heidorn, M.D., Warden William Pollard and James Greer be and hereby is **granted**. (Docket #63).

**IT IS FURTHER ORDERED** that judgment shall be entered in favor of defendants Jeananne Greenwood, Richard Heidorn, MD, Warden William Pollard, and James Greer, with regard to the plaintiff's claims that they were deliberately indifferent to his serious medical needs while he was incarcerated at Green Bay Correctional Institution.

**IT IS FURTHER ORDERED** that, on or before **October 15, 2010**, the plaintiff shall identify by name the John Does and Jane Does listed in his complaint so that they can be served. If the plaintiff does not identify the John Doe and Jane Doe defendants by

**October 15, 2010**, the plaintiff's deliberate indifference claims against them will be dismissed.

Dated at Milwaukee, Wisconsin this <u>31st</u> day of August, 2010.

BY THE COURT:

<u>s/Patricia J. Gorence</u>
Patricia J. Gorence
United States Magistrate Judge